IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

ROGER D. DUNN                                                                                              PLAINTIFF

V.                             Civil No. 2:21-cv-02103-PKH-MEF

KILOLO KIJAKAZI[1], Acting Commissioner,
Social Security Administration                                                                      DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Roger Dunn, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying his claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 423(d)(1)(A). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

### I.    Procedural Background

Plaintiff protectively filed his application for DIB on February 19, 2019, alleging disability since August 1, 2017, due to schizophrenia, hallucinations, bipolar disorder, blackouts, memory loss, back pain, depression, psychosis, suicidal thoughts, and homicidal tendencies. (ECF No. 12, pp. 99, 121, 201-204, 239, 247-248, 276-277). An administrative hearing was held on July 8, 2020. (ECF No. 12, pp. 51-97). Plaintiff was present and represented by counsel.

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act,42 U.S.C. § 405(g).

Born in 1969, Plaintiff was 48 years old on his alleged onset date and possessed an eighth-grade education. (ECF No. 12, pp. 30, 98, 120, 240). He had past relevant work ("PRW") experience as a machine operator, semi-truck driver, mechanic, and produce driver during the 15 years preceding his alleged date of onset. (ECF No. 12, pp. 226-234, 241, 257-264).

On September 3, 2020, the Administrative Law Judge ("ALJ") identified Plaintiff's borderline personality disorder, bipolar/depression with psychosis, anxiety/panic disorder, post-traumatic stress disorder ("PTSD"), degenerative disc disease ("DDD") of the thoracic spine with a small disc bulge, carpal tunnel syndrome ("CTS"), and syncope as severe impairments. (ECF No. 12, p. 22). She then concluded he did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id*. at 23). Despite his impairments, the ALJ found Plaintiff retained the residual functional capacity ("RFC") to perform light work, with frequent bilateral handling and/or fingering, and no work near hazards such as ladders, ropes, scaffolds, moving mechanical parts, unprotected heights, deep water, or open flames. (*Id*. at 25). Further, she concluded that Plaintiff could only perform simple, routine, repetitive tasks requiring simple work-related decisions, and social interaction that is incidental to the work performed. With the assistance of a vocational expert ("VE"), the ALJ ultimately decided there were jobs that exist in significant numbers in the national economy that the Plaintiff could perform, including production assembler, router, and price marker. (*Id*. at 31).

The Appeals Council denied Plaintiff's request for review on March 24, 2021. (ECF No. 12, pp. 6-11). Plaintiff subsequently filed this action on May 25, 2021. (ECF No. 2). Both parties have filed appeal briefs (ECF Nos. 14, 15), and the matter is ready for Report and Recommendation.

## II.     Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record to support the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(1)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial

3

gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § 404.1520(a)(4). The fact finder only considers Plaintiff's age, education, and work experience in the light of his RFC if the final stage of the analysis is reached. 20 C.F.R. § 404.1520(a)(4)(v).

### III. Discussion

Among other issues on appeal, the Plaintiff challenges the RFC determination, alleging that the ALJ failed to evaluate all the opinion evidence and explain why more significant limitations were not incorporated into the RFC.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545. A disability claimant has the burden of establishing his RFC. *Vossen*, 612 F. 3d at 1016. Although the United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question," this determination is not delegated to medical professionals or determined exclusively based on medical records. *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)); *see also Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (holding that a medical source opinion that a claimant is "disabled" or "unable to work" is not entitled to controlling weight). The final determination of RFC is left to the ALJ and based on all the relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012) (RFC is ultimately an administrative determination reserved to

Commissioner); *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (holding RFC should be based on all relevant evidence of record).

### A. Relevant Medical Evidence

The record makes clear that the Plaintiff has a history of mental illness. In October 2016, Dr. Javed Rana restarted him on Prozac for the treatment of anger and irritability issues. (ECF No. 12, pp. 393-397).

On June 28, 2017, Plaintiff was hospitalized for two weeks at Rivendell Behavioral Services ("RBS") for auditory hallucinations, blackout spells, and a suicide attempt. (ECF No. 12, pp. 429-441). Records indicate that he cut his wrists while in jail on child support charges. On intake, he was noted to have a depressed, anxious, and constricted mood and affect and a urine drug screen positive for cannabinoids. Admission diagnoses were major depressive disorder with psychosis and drug abuse. While inpatient at RBS, Plaintiff was medicated and provided with both individual and group activities designed to develop positive coping skills. He was discharged on July 12, 2017, with an improved mood and fair prognosis.[2] His prescriptions included Lithium, Seroquel, and Trazodone. RBS staff also prescribed outpatient treatment at Counseling Associates ("CA").

In September 2017, Plaintiff established with Ashley Frinkle, a licensed professional counselor at CA for PTSD, major depressive disorder ("MDD") with psychotic and possible bipolar features, borderline personality disorder, social anxiety disorder, and cannabis use disorder. (ECF No. 12, pp. 576-581). He was alert, oriented, and appeared motivated to get treatment for his poor anger control, which he claimed caused him to blackout twice per week, and for his social

---

[2] In psychiatric terms, a fair prognosis indicates that the individual suffers from some symptoms that indicate he/she may be rehabilitated. *Vocational and Rehabilitation Prognosis*, *at* https://www.stokes-associates.com/blog/2019/1/2/vocational-and-rehabilitation-prognosis (last accessed April 25, 2022).

5

anxiety that made it difficult for him to be in crowds. Noting that his medications were helpful "for the most part," Plaintiff signed up for bi-monthly counseling sessions. During his second therapy session, he did not wish to make medication adjustments/changes, despite continued reports of persecutory delusions and visual hallucinations. (*Id*. at 572-575). Counselor Frinkle noted a euthymic mood, fair insight, and judgment.

The following month, Plaintiff reported an improved and stable mood with no recent blackout spells. (ECF No. 2, pp. 564-571). Counselor Frinkle documented some progress toward Plaintiff's treatment goals, although his prognosis remained guarded.[3] In November, his mood remained stable, and he reported the ability to manage his irritability despite being without a vehicle. (*Id*. at 560-563). However, on December 11, 2017, Plaintiff suffered some symptom regression after being without medication for 11 days. (*Id*. at 556-559). He was waiting on his wife to receive her paycheck so he could get his medications refilled.

On January 16, 2018, Plaintiff admitted that he had been off his medications for three days because he did not have the money for his co-pay. (ECF No. 12, pp. 552-555). He disclosed a recent anger outburst during his stepson's basketball game resulting in a verbal altercation with a referee and police involvement. Noting an anxious mood and full affect, Counselor Frinkle provided him with a medication voucher from the Salvation Army. After restarting his medications, his mood improved significantly. (*Id*. at 541-544). Counselor Frinkle noted normal speech and thought processes, although Plaintiff reported some continued anxiety. She also diagnosed him with bipolar I disorder.

---

[3] A guarded prognosis means that the counselor does not have enough information to predict the patient's treatment outcome. *Vocational and Rehabilitation Prognosis*, *at* https://www.stokes-associates.com/blog/2019/1/2/vocational-and-rehabilitation-prognosis (last accessed April 25, 2022).

In March and April 2018, Plaintiff's mood was anxious but stable. (ECF No. 12, pp. 533-540). He described some irritability but indicated that therapy helped calm him. Plaintiff had recently started a garden and, after obtaining a fishing license, was eager to go fishing. Noting some progress, Counselor Frinkle helped him process ways to manage his irritable mood.

Early the following month, Plaintiff divulged a lack of drive to do things and significant frustration related to alleged memory problems. (ECF No. 12, pp. 523-526). The medications, however, helped to "calm" his brain.

Plaintiff underwent a mental diagnostic evaluation on May 3, 2018, with Dr. Steve Shry. (ECF No. 12, pp. 442-446). The Plaintiff alleged disability due to psychosis, schizoaffective disorder, and depression, and added that he had been fired from his last job in 2017 for "threatening a co-worker." Dr. Shry described him as pleasant, friendly, and talkative, but unmotivated during the cognitive exam. His mood was both normal and stable and his thought processes logical, relevant, and goal directed. Dr. Shry found no evidence of psychotic process or memory deficits. After diagnosing him with other specified depressive disorder, borderline personality disorder, and cannabis use disorder, he concluded that the Plaintiff could handle his personal affairs; communicate in an intelligible and effective manner; comprehend and carry out simple and complex tasks; and cope with the typical demands of work-like tasks. Plaintiff did not, however, tolerate frustration well during the exam. And, due to symptoms associated with his depressive disorder and his borderline personality disorder, Dr. Shry noted that the Plaintiff might demonstrate significant impairment in his ability to sustain persistence when completing tasks. In the next sentence of his report, however, Dr. Shry stated that the Plaintiff did not seem to be impaired in his ability to complete tasks within acceptable timeframes. He went on to conclude that Plaintiff's acknowledged insight into his alleged visual and auditory hallucinations suggested

either a positive response to the medications prescribed or some symptom exaggeration and/or polysubstance abuse. Dr. Shry did not believe that this probable exaggeration was significant enough to invalidate his findings. Dr. Shry also found nothing to support a diagnosis of schizoaffective disorder, as alleged by the Plaintiff, as there was no evidence of tangential speech, disorganized thinking, or a blunted affect.

On May 17, Plaintiff complained of depression over the previous week and processed his insecurities concerning his physical health and his inability to provide for his family. (*Id*. at 519-522). On exam, he exhibited a euphoric mood with manic thoughts and pressured speech. Two weeks later, after the nurse decreased his Seroquel dosage, he said he felt fine, but his family described him as very irritable and snippety. (*Id*. at 515-518). Therefore, his original dosage was reinstated.

On June 21, Plaintiff was depressed and guarded, reporting that he was "not good at all." (ECF No. 12, pp. 511-514). He had been isolating and fighting with family members. Noting some regression, Counselor Frinkle recommended that he continue with therapy. In July, Plaintiff described continued irritability and some short-term memory issues. (*Id*. at 508-510). He was, however, able to write down several self-calming statements to use to deter future anger outbursts.

Also in July, Plaintiff complained of headaches, visual disturbances, dizziness, depression, and anxiety. (ECF No. 12, pp. 471-476). Due to seeing flashes of light, he also requested a neurology referral. Dr. John McAuley at Family Practice Associates ("FPA") diagnosed schizophrenia and other seizures before ordering a cranial MRI, an electroencephalogram ("EEG"), and a carotid ultrasound and referring Plaintiff to neurology. The MRI was negative; the EEG revealed no focal or eleptiform abnormalities; and the carotid ultrasound was normal. (*Id*. at 460, 696-697).

On August 7, 2018, Plaintiff was able to reframe his negative thoughts with less prompting and processed self-care and several recent anger episodes. (ECF No. 12, pp. 505-507). He could not, however, explain why he ran out of medication for one week, as he had been using a pill sorter. Counselor Frinkle noted some progress with a guarded prognosis.

In October, Plaintiff reported that he had been "ok" and was able to perform his activities of daily living. (ECF No. 12, pp. 502-504). Despite worries regarding his physical health, his mood was relatively stable, and his speech normal. Plaintiff reported no recent anger outbursts and advised Counselor Frinkle that Dr. Keating had recently prescribed Topiramate. Noting good progress toward his treatment goals, Counselor Frinkle advised Plaintiff to continue with his mental health treatment. Plaintiff's mood remained stable through November, at which point Counselor Frinkle noted no significant change since his last visit and evidence of positive cognitive self-talk. (*Id*. at 499-501). However, emotions continued to run high in his family.

On February 21, 2019, Plaintiff indicated he had discontinued his medications for several weeks only to later reinstate them. (ECF No. 12, pp. 495-498). He was irritable, isolating more, and experiencing sleep disruption. Counselor Frinkle noted him to be at his baseline, since restarting his medications. She spent time exploring his reasons for discontinuing the medications and ways the medications had helped him. Plaintiff recognized his need for both medication and therapy and agreed to attend his therapy appointments and to schedule an appointment with the nurse practitioner. When he returned in April, he processed the sources of his low self-esteem and problem-solved ways to gain additional insight. (*Id*. at 492-494, 607-609). However, the Plaintiff continued to report aggravation due to memory difficulties. At this time, his speech was pressured, and his hygiene was poor.

On May 13, 2019, Dr. Teresa Kramer reviewed the treatment notes of record and concluded Plaintiff would have moderate limitations in the following areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (ECF No. 12, pp. 106-107, 110-112).  Further, she assessed moderate restrictions in the following areas: understanding, remembering, and carrying out detailed instructions; maintaining attendance and concentration for extended periods; maintaining regular attendance; being punctual within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; completing a normal workday or workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; and responding appropriately to changes in work setting. Ultimately, however, Dr. Kramer concluded the Plaintiff could perform work where the interpersonal contact is incidental to the work performed; the tasks are simple, routine, repetitive, and learned by rote with few variables and little judgment; and the supervision required is simple, direct, and concrete.

Nine days later, Plaintiff reported continued memory lapses, reportedly losing hours at a time.  (ECF No. 12, pp. 603-605).  Family members also advised him that he had been talking to himself, although he was not aware of doing so.  His sleep was poor, and he was having a difficult time getting motivated.  Counselor Frinkle helped him process his stressors, mainly financial difficulties, and explore ways to reduce irritability.  She noted minimal progress with a guarded prognosis.

When he returned to therapy in July 2019, Plaintiff was receptive to Counselor Frinkel's impending move to River Valley Counseling and Therapy and was willing to continue his treatment at her new location.  (ECF No. 12, pp. 600-602).  Emotions reportedly remained high at home, and he continued to process ways to combat his anger outbursts.  Counselor Frinkle noted minimal progress with a guarded prognosis.

On September 25, 2019, Dr. Nicholas Rios conducted an independent review of the record, and he affirmed Dr. Kramer's mental RFC assessment.  (ECF No. 12, pp. 129-131, 134-136).

In October 2019, Plaintiff was admitted for inpatient treatment at St. Vincent Behavioral Health.  (ECF No. 12, pp. 742-745).  Page one of the six-page report is missing, but it appears he was hospitalized for 7-12 days due to suicidal ideations.  Plaintiff stated that he had been prescribed Lithium and Seroquel at Rivendell, but found the Seroquel to be too sedating, so he decreased the dosage himself.  He felt this adjusted dosage was good for him as it helped control his auditory and visual hallucinations.  Moreover, Plaintiff reported daily use of marijuana with a history of methamphetamine use and chronic Hydrocodone use both in full remission.  He described his mood as "bored to death" with an expansive yet labile affect, and Dr. Stacy Simpson noted that he laughed at inappropriate times during the interview.  Plaintiff was alert and fully oriented with intact recent and remote memory and no obvious cognitive deficits.  Dr. Simpson estimated his IQ to be in the average range with mostly goal directed thoughts.  His thought content, however, was positive for both auditory and visual hallucinations.  Impulsivity was also high due to his mood liability and agitation, and his judgment and insight were significantly impaired.  Dr. Simpson diagnosed bipolar disorder, most recent episode manic, with psychosis; cannabis use disorder; a history of chronic obstructive pulmonary disease; and rule out possible seizure disorder.

On October 25, 2019, after his release, Plaintiff reestablished with Counselor Frinkle at her new location. (ECF No. 12, pp. 760-768). He reported extreme mistrust of others and severe mood swings resulting in verbal aggression towards others. Counselor Frinkle noted that his new treatment plan would focus on encouraging him to remain medication compliant and providing him with the coping skills to reduce mood swings and impulsivity that had, historically, led him to harm himself and others.

Counselor Frinkle provided an assessment of Plaintiff's condition on June 24, 2020. (ECF No. 12, p. 729). She indicated the Plaintiff was under treatment for severe bipolar disorder with psychotic features and PTSD, having been hospitalized several times in the past five years. Counselor Frinkle felt the Plaintiff was chronically mentally ill and had not responded to treatment as hoped. He had limited insight into the severity of his mental health problems; needed constant prompts to care for his hygiene; was not able to maintain normal social relationships with others due to continued social withdrawal and psychosis; had no real friends; seemed to experience periodic delusions of persecution; lacked the motivation to focus on and follow through with tasks on an ongoing basis; and was likely unable to relate to others around him in an appropriate manner.

On July 9, 2020, Dr. William Williams at Family Practice Associates diagnosed the Plaintiff with schizophrenia and bipolar disorder. (ECF No. 12, pp. 771-772). He referred Plaintiff to Dr. William Kindrick at the Center for Psychiatric Wellness.

### B. Analysis

Unfortunately, the ALJ failed to account for much of this evidence in her opinion. Instead, she provided only a summary of Counselor Frinkle's treatment notes and discounted the counselor's 2020 opinion because she found it to be largely based on the Plaintiff's own subjective complaints and contradicted by Dr. Shry's opinion. However, we note that Dr. Shry's assessment

is of limited value, as it was based on a one-time consultative examination of the Plaintiff and does not include an actual mental RFC assessment. *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000) (holding the report of a one-time examiner does not constitute substantial evidence, especially when contradicted by a treating source). Dr. Shry also had very limited access to the Plaintiff's treatment history, reviewing only his 2017 Rivendell hospitalization records and one treatment note from Counselor Frinkle dated March 14, 2018. On the other hand, Counselor Frinkle's opinion[4] was based on an established counselor-patient relationship spanning three years. The Plaintiff even followed her from one clinic to another. We are hard pressed to comprehend why a one-time consultant's opinion would be the standard by which all other opinions are gauged, when the record contains an opinion from a long-time treating source that is supported by longitudinal records documenting the Plaintiff's fight with bipolar disorder, depression, anxiety, and PTSD.

We also find no evidence to indicate that Counselor Frinkle's assessment was based solely on the Plaintiff's subjective complaints. Instead, her assessment was based on her observations of the Plaintiff's mental status between September 2017 and June 2020. Her treatment records document Plaintiff's ongoing battle with mental impairments, including bipolar disorder with psychotic features, anxiety, and aggression. While Counselor Frinkle did note some progress toward his treatment goals at times, his prognosis remained guarded; and the Plaintiff's struggle with mental illness is clearly evident in her treatment notes documenting the waxing and waning of his symptoms in spite of both medication and counseling.

---

[4] And we note, as does the Plaintiff, that Counselor Frinkle was part of a treatment team at both Counseling Associates and River Valley Counseling and Therapy, working under the careful eye of a licensed physician. *Shontos v. Barnhart*, 328 F.3d 418, 426-427 (8th Cir.2003) (giving treating source status to opinions of nurse practitioner and counselor rendered as a part of a medical team).

Further, despite finding Dr. Shry's opinion to be persuasive, the ALJ failed to include his limitations in the RFC determination.  Dr. Shry noted difficulty tolerating frustrating situations and impairment in his ability to interact in a socially adequate manner.  Although inconsistently, he also documented impairment in the Plaintiff's ability to sustain persistence when completing tasks.  This limitation is echoed in Counselor Frinkle's statement that the Plaintiff lacked the motivation to focus on and follow through with tasks on an ongoing basis.  Without seeking clarification from Dr. Shry, the ALJ arbitrarily concluded that he meant the Plaintiff had no impairment in completing tasks.  *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (duty to seek clarification from treating physician arises when a crucial issue is undeveloped or underdeveloped).  While the ALJ is free to disagree with a medical source, she cannot make medical decisions.  *Finch v. Astrue*, 547 F. 3d 933, 937-938 (8th Cir. 2008) (ALJ must not substitute his opinions for those of a physician) (citations omitted).

Additionally, while there is some evidence of medication non-compliance and marijuana usage, we note the Plaintiff was diagnosed with bipolar disorder by Counselor Frinkle, Dr. Simpson, and Dr. Williams.  The United States Court of Appeals for the Eighth Circuit has held that a mentally ill person's non-compliance with psychiatric medications may well be "the result of the mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse." *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (citations omitted).  Psychological and emotional difficulties often deprive a Plaintiff of "the rationality to decide whether to continue treatment or medication." *Id*.  Similarly, co-occurring mental disorders are common in patients suffering from bipolar disorder, with one of the most common comorbid disorders being substance use disorder.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM") 5 105, 132 (5th ed. 2013).  Substance use disorder has been found to occur in over half of the individuals

with bipolar I disorder. *Id*. at 132. Therefore, while it is not clear that substance abuse precipitates bipolar disorder, the reverse is clear. Frederick K. Goodwin & Kay Redfield Jamison, Manic-Depressive Illness 219-25 (2d ed. 1990); Li-Tzy Wu et al., Influence of Comorbid Alcohol and Psychiatric Disorders on Utilization of Mental Health Services in the National Comorbidity Survey, 156 *Am. J. Psychiatry* 1235 (1999); Edward J. Khantzian, The Self-Medication Hypothesis of Addictive Disorders: Focus on Heroin and Cocaine Dependence, 142 *Am. J. Psychiatry* 1259, 1263 (1985). Both issues should have been addressed by a treating physician and considered by the ALJ prior to the rendering of a final opinion in this case.

Accordingly, the Court finds that remand is necessary to allow the ALJ to reconsider the Plaintiff's mental impairments. In so doing, she is directed to order a new consultative mental evaluation of the Plaintiff, providing the examiner with all the Plaintiff's mental health treatment records to date. The examiner should then be asked to complete a thorough mental RFC assessment. The ALJ is further directed to contact Counselor Frinkle to have her opine as to the relationship, if any, between Plaintiff's bipolar disorder and his medication non-compliance and marijuana use and to also complete a formal mental RFC assessment.

### IV.    Conclusion

For the reasons stated above, I recommend reversing and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 26th day of April 2022.

/s/ Mark E. Ford
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE